ACCEPTED
05-15-01483-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
12/7/2015 12:00:00 AM
LISA MATZ
CLERK

IN THE COURT OF APPEALS
FOR THE FIFTH DISTRICT OF TEXAS
AT DALLAS

| | | |
|---|---|---|
| City of Sachse, | § | FILED IN<br>5th COURT OF APPEALS<br>DALLAS, TEXAS |
| | § | |
| Appellant, | § | 12/6/2015 4:09:35 PM |
| | § | LISA MATZ<br>Clerk |
| v. | § | CAUSE NO. 05-15-01483-CV |
| | § | |
| Dan Wood, | § | |
| | § | |
| Appellee. | § | |

## APPELLANT'S REPLY IN SUPPORT OF EMERGENCY MOTION TO STAY PROCEEDINGS IN THE TRIAL COURT PENDING APPEAL

On Appeal from Cause No. DC-12-00218-M in the
298th Judicial District Court of Dallas County, Texas

TO THE HONORABLE JUSTICES OF THIS COURT:

COMES NOW, Appellant City of Sachse (the "City") and files this reply in support of its emergency motion to stay the proceedings in the trial court pending a resolution of the City of Sachse's interlocutory appeal. In support thereof, the City of Sachse respectfully shows the following:

1.      Appellee Dan Wood ("Wood") opposes the City's Emergency Motion to Stay Proceedings based on his belief that the City's Plea to the Jurisdiction was not timely. However, the timeline of events conclusively establishes that the City timely filed its Plea to the Jurisdiction, Notice of Appeal and Emergency Motion to Stay the Proceedings.

2.      Wood's Original Petition alleged causes of action based on the Texas Whistleblower Act, Chapter 554 of the Government Code, as well as Government Code Section 614. Wood asked for damages, attorney's fees and reinstatement. Wood could obtain all of this relief based on his whistleblower claim. His only available relief on his Government Code Section 614 is reinstatement.

3.     The City filed a Plea to the Jurisdiction on Wood's whistleblower claim which the trial court denied. The City took an interlocutory appeal. The Fifth Court of Appeals reversed the denial of the Plea; dismissed Wood's whistleblower claim; and remanded the Government Code Section 614 claim back to the trial court for final disposition. This Court's opinion and order are dated March 26, 2014. The style of the appellate case is *City of Sachse v. Dan Wood*, Cause No. 05-13-00773-CV.

4.     Following the remand, the trial court issued a scheduling order which among other things set the deadline for amending pleadings to July 1, 2015; the deadline to conduct discovery to August 23, 2015 and the case was to be tried on November 23, 2015. The trial date was later continued to December 7, 2015.

5.     On April 4, 2015, Wood filed his First Amended Petition which amended Wood's Government Code Section 614 Claim.[1] This claim is currently Wood's only cause of action. During the course of discovery, it became apparent that Wood was expanding the scope of Government Code Section 614 beyond all reason. For example, Wood claims that he is entitled to discovery from the City and that he has a right to put on any evidence or arguments he believes is necessary at disciplinary and appeal conferences conducted by the City. He also claims that he is entitled to all the remedies provided for under the Texas Whistleblower Act including front pay, back pay and attorney's fees.[2]

6.     Wood's interpretation of his Government Code Section 614 claim is well beyond the scope of the statute and thus subject to a Plea to the Jurisdiction. Subsequently, the City of Sachse filed its Plea to the Jurisdiction on September 23, 2015.

---

[1] *See* Plaintiff's First Amended Petition attached hereto as Exhibit "A" and incorporated herein by reference.
[2] *See* Plaintiff's Sixth Response to the City's Request for Disclosure attached hereto as Exhibit "B" and incorporated herein by reference and compare to this Court decision in *City of Seagoville v. Lytle*, 227 S.W.3d 401 (Tex.App-Dallas 2007, no pet).

The earliest available hearing date was November 13, 2015. The Plea was heard on November 13, 2015 and the trial court took the motion under advisement. The trial court signed an order denying the Plea on Friday, December 4, 2015. Within hours of receiving the order denying the Plea to the Jurisdiction, the City filed its Notice of Appeal with the trial court and its Emergency Motion to Stay the Proceedings. Under these circumstances, the City was timely in its request for an Emergency Motion to Stay the Proceedings.

Prayer

WHEREFORE, premises considered, the City of Sachse respectfully requests that the Justices of this Honorable Court grant the instant motion and, pursuant to Rule 29.3 of the Texas Rules of Appellate Procedure, enter an order staying all proceedings in the trial court pending resolution of the Appeal, and grant the City of Sachse any and all further relief to which it may show itself justly entitled.

Respectfully submitted,

MARIS & LANIER, P.C.


/s/ Robert F. Maris
Marigny A. Lanier
State Bar No. 11933200
mlanier@marislanier.com
Robert F. Maris
State Bar No. 12986300
rmaris@marislanier.com
3710 Rawlins Street, Suite 1550
Dallas, Texas 75219
214-706-0920 telephone
214-706-0921 facsimile

ATTORNEYS FOR APPELLANT
CITY OF SACHSE


## CERTIFICATE OF SERVICE

This is to certify that a true, correct and complete copy of the foregoing document has been served in accordance with of the Texas Rules of Appellate Procedure on the 6th day of December, 2015 to:

Christopher Ayres
Ayres Law Office, P.C.
4350 Beltway Drive
Addison, Texas 75001


/s/ Robert F. Maris
Robert F. Maris

# EXHIBIT "A"

CAUSE NO. DC-12-00218

| | | |
|---|---|---|
| DAN WOOD, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | DALLAS COUNTY, TEXAS |
| | § | |
| CITY OF SACHSE, | § | |
| | § | |
| Defendant | § | 298TH JUDICIAL DISTRICT |

## PLAINTIFF'S FIRST AMENDED PETITION

### TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Dan Wood, Plaintiff and for cause of action would respectfully show the Court as follows:

### I. DISCOVERY CONTROL PLAN

1.1     Plaintiff requests Level 2 Discovery pursuant to TEX. R. CIV. P. 190.

### II. PARTIES

2.1     Plaintiff Daniel Wood (hereinafter referred to as "Plaintiff" or "Lieutenant Wood") is a resident of Collin County, Texas

2.2     Defendant, City of Sachse, Texas (hereinafter referred to as "Defendant", "City of Sachse" or "Sachse") is a Texas municipal corporation located in Dallas County, Texas and Collin County, Texas. The Defendant's principal office and place of business is its City Hall which is located in Dallas County, Texas at 3815 Sachse Road, Building B, Sachse, Texas 75048. Defendant has been served with citation of suit and has made an appearance in this lawsuit.

### III. JURISDICTION AND VENUE

3.1 Pursuant to Texas Rule of Civil Procedure 47(b), the damages sought by Plaintiff are within the jurisdictional limits of this Court. Pursuant to Texas Rule of Civil Procedure 47(c), Plaintiff seeks monetary and/or injunctive relief over $200,000 but not more than $1,000,000.

3.2 Venue of this action is proper in Dallas County pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002(a), because a substantial portion of the acts or omissions giving rise to this lawsuit occurred in Dallas County, Texas and the Defendant resides in and/or maintains a principal office in Dallas County, Texas.

### IV. FACTUAL BACKGROUND OF THE CASE

4.1 Plaintiff Dan Wood was a lifelong firefighter and paramedic, who had spent decades working in the fire service in the Dallas/Fort Worth area.

4.2 On December 25, 2006, Plaintiff was hired by Defendant City of Sachse as a firefighter/paramedic. In 2007, for the first time, Defendant announced open, merit-based promotional examinations, one of which was for the rank of lieutenant. After testing, Plaintiff was promoted to Lieutenant of Defendant's Fire Department in November of 2007. Thereafter, the Plaintiff received consistently high marks and evaluations in his role as an officer.

4.3 Continuing an interest that had originated during his prior service, Plaintiff assisted in the training and creation of leadership roles within Defendant's Fire Department. This included suggestions relating to a formal training program, formulation of administrative policies and procedures, and other technical matters. In approximately March of 2009, Plaintiff was designated as the "Fire Training Officer" for the Defendant's Fire Department. Plaintiff's appointment was simply to oversee continuing education and training for fire operations only,

not for emergency medical services (EMS) operations, which was supervised by a separate training officer in the Department.

4.4     At all times relevant to the suit, Defendant's Fire Chief was Chief Douglas Kendrick. Captain Rick Coleman was designated as the Fire Operations Officer for Defendant's Fire Rescue Department. Captain Robert Knappage was designated as the EMS Operations Officer and also served as the Fire Marshall for Defendant's Fire Rescue Department. Ms. Cheree Bontrager was the Defendant's Director of Human Resources. Mr. Billy George serves as Defendant's City Manager.

4.5     After his appointment in March of 2009, Plaintiff undertook a comprehensive analysis of the policies and procedures of Defendant in an attempt to establish a formal training and testing program. Prior to his appointment in 2008, Plaintiff had proposed a comprehensive training and testing program which was never adopted by Defendant or Chief Kendrick. On March 22, 2009, Plaintiff resubmitted this program to Chief Kendrick. On January 30, 2009, the proposed curriculum for the program was discussed in a staff meeting, but ultimately Plaintiff's proposed curriculum was again rejected by Chief Kendrick and others. Although Plaintiff reasserted the need for improvement in a testing program and curriculum, Chief Kendrick again rejected the curriculum in April of 2009.

4.6     Also, in the Spring of 2009, Plaintiff presented a number of other developmental program proposals to assist Defendant's Fire Rescue Department. These included a proposed developmental program to help establish objective promotional examination standards and procedures, testing, and a formal promotional process for Defendant's Fire Rescue Department. Plaintiff also proposed a "driver/operator" program, by which members could gain additional training and knowledge to assist in fire operations. In May of 2009, Plaintiff proposed a "one

job, one standard" policy by which all full and part-time employees would be hired, trained, and tested in the same manner. Plaintiff received no meaningful response to any of his proposals. To the best of Plaintiff's knowledge, there was no response or action taken of any kind with regard to his developmental program or driver/operator program. As to the "one job, one standard" proposed policy, the sole response from Chief Kendrick's was an email in which he stated he "appreciate[d] your diligence," but again took no actions.

4.7     Shortly after a staff meeting, on August 28, 2009, Chief Kendrick requested that all officers provide guidance and input to him concerning a new "bi-weekly" reporting system required by the Defendant's City Manager.

4.8     In September of 2009, after reviewing all of the reporting and documentation policies and procedures of Defendant as requested, Plaintiff proposed a very significant, detailed monthly reporting system to be utilized in Defendant's Fire Rescue Department. Plaintiff attached a variety of forms and check sheets that he believed were also necessary. This proposal encompassed required documentation, reporting and supervision for both the fire and EMS operations within Defendant's Department. The stated goal of this proposed monthly or bimonthly reporting was to foster accountability and audits – both of which were (then) completely absent from Defendant's day-to-day operations. Although critical to orderly operation and management, Plaintiff received no response until his monthly report recommendation was ultimately rejected by Defendant, largely through Chief Kendrick. Instead, Defendant chose to operate its department using a vague, general set of policies that provided no specific guidance or detail to its employees and officers concerning a host of matters.

4.9     After being asked to handle the training aspects of Defendant's fire operations but then receiving no meaningful response or agreement on any of his proposals, Plaintiff became

extremely concerned. In December of 2009, Plaintiff drafted a letter outlining his concerns and requested direction about what was and would be expected from him as the fire operations training officer because Defendant has rejected or not responded to any of the proposals outlined by him. Because of the sensitive nature of this subject, Plaintiff approached Ms. Bontrager, Director of Human Resources Department, to ask her if such a letter was appropriate. Ms. Bontrager responded that it was very appropriate and, accordingly, Plaintiff presented the letter to Chief Kendrick. In the letter, Plaintiff specifically requested that he be given direction and a clear set of expectations (for himself and for the Department) or that Chief Kendrick relieve him from further responsibilities as the fire operations training officer. Again, Plaintiff received no response from Chief Kendrick nor the Department concerning his December letter. The same lack of specificity and direction continued throughout 2010.

4.10    In May of 2011, Plaintiff again requested that the Defendant provide him expectations concerning his roles and responsibilities as the training fire operations officer. In a memo to Captain Coleman on April 21, 2011, Plaintiff stated that he had no real authority or meaningful policies by which to handle his job duties. In response to that, Captain Coleman requested that the *__Plaintiff__* tell the *__Defendant__* what duties and authority Plaintiff believed were appropriate for his position. Captain Coleman also contended that the Department had placed Plaintiff's proposed training and testing program into departmental policy, although there was no formal documentation or official action evidencing such action.

4.10    In July of 2011, Plaintiff repeated the same request, that he be provided direction and again stressed that the lack of direction and guidance from Defendant was placing him in an untenable position.

4.11    Even as late as July 26, 2011, Plaintiff continued making proposals of policies and procedures that would improve accountability, documentation, training, and administration of the Department. The Defendant's responded with continued silence.

4.12    In September 2011, Plaintiff was assigned to be the officer in charge of Defendant's "B" shift. Under standard operating procedures, Defendant's Fire Rescue Department rotated shift personnel on a three day system, utilizing an A, B, and C shift, effectively meaning personnel would work every third day.

4.13    Defendant's personnel supervision was in reality split between two stations. Station 1, which was located next to City Hall, was the newer of the two stations. On a normal working shift, there were approximately four firefighters/paramedics assigned to work in Station 1 with one additional officer supervising. At Station 2, the Defendant assigned two firefighters/paramedics to operate the ambulance. There was no officer assigned to Station 2.

4.14    At all times relevant to this suit, Captain Coleman was assigned the responsibility of officer in charge of A Shift. Plaintiff was assigned the responsibility of officer in charge of B shift. Lieutenant Willoughby was assigned the responsibility of officer in charge of C shift.

4.15    Defendant's Fire Rescue Department continued to use both full and part-time personnel.

4.16    Since early 2003, Defendant's Fire Rescue supervision policies were extremely vague and non-specific. There was no detail about the timing and frequency of officer supervision on a variety of tasks, including documentation. No forms or categories of forms were mentioned in any policies concerning officer supervision. As to any training program required of Plaintiff, there was no documentation about how, when, or who should be trained and/or supervised.

4.17 On Friday, September 9, 2011, Plaintiff arrived to work at Station 1. Shortly after arriving, he heard a disturbance out in the apparatus room, where all the equipment and vehicles were located. Plaintiff then proceeded to the apparatus room and found Mr. Greg Fenn, a part-time paramedic/firefighter with Defendant, in a highly frustrated and agitated state.

4.18 Mr. Fenn indicated that, during his inventory and restocking of the ambulance at Station 1, he had noticed that there were expired, inadequate, and missing medications. Mr. Fenn stated this had happened on several prior occasions, as well. Mr. Fenn indicated that he was frustrated and tired of consistently noting these problems and yet, Defendant's EMS operations supervisors never addressed or corrected them. Mr. Fenn then stated words to the effect of "I cannot do this anymore." Plaintiff originally understood Mr. Fenn to be expressing his frustration, as he had done on prior occasions. Plaintiff told Mr. Fenn that he understood his concerns, that Plaintiff had previously relayed those concerns, and that Plaintiff would give him whatever support was necessary to help remedy the situation.

4.19 Plaintiff then began resuming his other station duty work until approximately 7:30 a.m. when he then noticed Mr. Fenn packing up his gear into his personal vehicle. Plaintiff then approached Mr. Fenn and asked him about his status. Mr. Fenn then stated he was resigning and no longer desired to work for Defendant, as doing so may compromise his professional licensure. Plaintiff then asked Mr. Fenn to reconsider, but Mr. Fenn declined.

4.20 At this point, as the command officer on duty, Plaintiff was confronted with several serious issues. First, he now had an ambulance out of service because it did not have the proper staffing because of Mr. Fenn's unexpected resignation. Second, Plaintiff was aware that Mr. Fenn had not addressed and remedied the expired, inadequate, and missing medications he previously discovered. In addition, several of Plaintiff's other daily checks remained

outstanding. All of these situations put patients and the citizens of the Defendant at risk. Under both state and federal law, Plaintiff was required, as a certified paramedic and officer, to remedy these situations immediately and without delay.

4.21 Because of an inadequate stock and inventory at Station 1, Plaintiff then contacted Station 2 and asked them to conduct a full and complete inventory of their ambulance, all their apparatus, and their stock room. Plaintiff also began searching for a replacement for Mr. Fenn. During the inventory and restocking of the apparatus, Plaintiff located sufficient supplies at both Station 1 and Station 2 to adequately supply both ambulances. Plaintiff immediately notified Captain Coleman, who was in charge of the inventory of the noted insufficiencies, and requested him to do an emergency order of supplies. Handling the orders and inventory was not part of Plaintiff's normal and daily job responsibilities; instead, these matters were the responsibility of Captain Coleman. At that time, Plaintiff did not address with Captain Coleman the reason(s) why there was such a significant deficiency of supplies.

4.22 Plaintiff was also able to locate a substitute for Mr. Fenn, and, as an officer, ordered the substitute employee to Station 1 to assist in staffing the ambulance.

4.23 During this time, Plaintiff was alerted by an employee of the Defendant that Mr. Fenn posted a message on his Facebook account to the effect of he had resigned from the Defendant, and that he, Fenn, no longer desired to work there because of the structure and management of Defendant's EMS system. Plaintiff then attempted to contact Mr. Fenn to instruct him to remove the statement from Facebook.

4.24 On or about this time, at approximately 8:45 a.m., Plaintiff was approached by Captain Knappage who had also become aware of the Facebook posting. Plaintiff alerted Captain Knappage that Mr. Fenn had quit approximately one hour and fifteen minutes prior as a

paramedic of the Defendant, because Captain Knappage was the officer in charge of Defendant's EMS operations. Plaintiff gave Captain Knappage a brief description of the issues raised by Mr. Fenn, the problems that Plaintiff had personally observed that morning, and Plaintiff's planned and continuing efforts to correct all the issues. Captain Knappage then directed Plaintiff to prepare memorandum and summaries of the issues he observed as soon as possible.

4.25 At approximately 10:02 a.m., Plaintiff sent Captain Knappage a formal memorandum outlining the resignation of Greg Fenn, as well as Plaintiff's actions to request Mr. Fenn to remove his Facebook posting.

4.26 While conducting the inventory and examination of all matters on the morning of September 9, 2011, Plaintiff learned that there were a number of expired medications on A-1 (the ambulance at Station 1) and A-2 (the ambulance at Station 2). Plaintiff reviewed the books and records of each station to determine which paramedics worked on those ambulances and why they had failed to note the expired nature of the medications and/or replace these medications. After conducting an examination of those matters, Plaintiff then presented a memorandum to Captain Knappage at approximately 11:30 a.m. concerning the expired medications and the personnel working on them. A supplemental memorandum was to be provided later that afternoon.

4.27 On or about 12:48 p.m., Mr. Fenn sent an email to all personnel in Defendant's Fire Rescue Department. Ms. Bontrager, as Director of Human Resources, was also provided this email. In the email, Mr. Fenn stated that he was resigning due to a "lack of accountability and professionalism with how the EMS side is handled..." Mr. Fenn relayed his frustration with prior instances that were unaddressed and the danger of expired and missing medications, including "controlled narcotics." Mr. Fenn completed his email by stating that he had filed a

formal complaint against the Defendant with the Texas Department of State Health Services. Mr. Fenn stated, "The intention is to improve the quality of services the EMS system provides."

4.28    The email sent by Mr. Fenn never mentioned Plaintiff. Mr. Fenn's email completely and consistently takes issue with the EMS operations of the Defendant's Fire Rescue Department, for which Plaintiff had no ongoing role or responsibility. Instead, the issues raised by Mr. Fenn were the responsibility of Chief Kendrick, Captain Knappage, and/or Captain Coleman. Upon learning that the Defendant had later used this email as a complaint against Plaintiff, Mr. Fenn apparently delivered a letter to the Defendant stating that he had the upmost confidence in Plaintiff, that Plaintiff had been a superior and steady officer, that Plaintiff had attempted to resolve all issues previously raised by Mr. Fenn, and that Mr. Fenn's issues were with Chief Kendrick, Captain Knappage, and the EMS operations side of the Fire Department – not with the Plaintiff.

4.29    During Plaintiff's investigation on September 9, 2011, in addition to the expired medications, Plaintiff noticed that there were other deficiencies in the paperwork and documentation of multiple paramedics. Upon investigation, Plaintiff learned that these problems persisted at both stations and across all three shifts during the month of September. This included Plaintiff's shift, Captain Coleman's shift, and Lieutenant Willoughby's shift. In essence, the personnel working under these officers had not been completing their paperwork in a diligent and appropriate manner. Upon reporting this issue to Captain Knappage, Captain Knappage instructed Plaintiff to undertake a review back to the first day of September and to prepare a memorandum.

4.30    While preparing his memorandum, Plaintiff learned that his shift had also failed to properly complete certain paperwork relating to A-2 prior to September. Although not

ordered or instructed by Captain Knappage to do so, Plaintiff included this finding in his memorandum in an effort to be complete, accurate, and to further the best interest of Defendant's Fire Rescue Department.

4.31 Because of the seriousness of the issues, on September 9, 2011, Plaintiff requested that Captain Coleman come to Station 1 to personally oversee ordering the inventory. When Captain Coleman arrived, Plaintiff alerted him to the issues with both medications and paperwork, including his shift's deficiencies. Plaintiff alerted Captain Coleman to his issuance of various memos, in accordance with the orders of Captain Knappage.

4.32 Similarly to his conversation with Captain Coleman, Plaintiff also sent a text message to Lieutenant Willoughby requesting a meeting. Although Lieutenant Willoughby did not respond, the next morning, after Lieutenant Willoughby arrived, Plaintiff went over all of the issues and memorandum with Lieutenant Willoughby. In addition to discussing the issues with Lieutenant Willoughby, Plaintiff apologized to Lieutenant Willoughby for B shift's lack of documentation, inventory, and the general "mess" at Station 2. Plaintiff thought this apology necessary because his shift (B Shift) should have shown Lieutenant Willoughby's shift (C Shift) the courtesy of a clean and properly documented station. Plaintiff then told Lieutenant Willoughby that he intended to go by Station 2 to discuss with C Shift whether they had noticed any of the prior issues with B shift at Station 2, to relay his apology, and to continue his investigation, as ordered by Captain Knappage. Lieutenant Willoughby expressed no reservation with Plaintiff's planned course of action.

4.33 Accordingly, at approximately 7:45 a.m. on September 10, 2011, Plaintiff arrived at Station 2 to both apologize and gather information for his investigation. At this point, all memorandums were turned in to Captain Knappage, per his orders. Plaintiff then discussed with

the C Shift at Station 2 the various problems he had observed regarding documentation for all shifts, the lack of inventory and medication controls, and other deficiencies. Specifically, Plaintiff asked the C Shift why they had not alerted him or Lieutenant Willoughby to any of the problems noticed concerning B Shift, and why they themselves had not properly handled documentation and other matters.

4.34    At the time of the incident, as well as during the "investigation" that followed, Chief Kendrick was out of the country, although he was presumably notified by Captain Knappage (acting Chief at the time) of a complaint that had been filed by Mr. Fenn and a potential significant ongoing investigation that was looming by the Texas Department of State Health Services. Nonetheless, Chief Kendrick did not return to work until September 26, 2011. In the interim, despite the serious and systematic failures (including violations of state and federal law) noted by Plaintiff and relayed to Captain Knappage, as well as a potentially catastrophic state investigation, Chief Kendrick allowed Captain Knappage to remain in complete operational control of Defendant's Fire Rescue Department.

4.35    On or about September 11, 2011, per the instructions and direction of the interim City Manager, Captain Knappage began an administrative inquiry and investigation based on the "complaints and the resignation letter of Greg Fenn." After reviewing the memorandum and information supplied by Plaintiff, which indicated systematic failures by over fifteen paramedics employed by the Defendant as well as a complete and utter failure of Captain Coleman and Captain Knappage to properly run and operate the EMS and supply system of the Defendant's Fire Rescue Department, Captain Knappage then met with Captain Coleman, Ms. Bontrager, and the Defendant's City Attorney. In that meeting, which occurred on or about September 12, 2011, the group decided to place *Plaintiff* on paid administrative leave beginning September 15, 2011.

4.36   On September 13, Plaintiff stopped by Station 2 to inspect the station just as he had on September 10th. Plaintiff noticed the required ambulance check sheet was missing from the log book. Plaintiff found one of the two people assigned to the station the day before, Shermonte Brooks, in the parking lot and asked him about the missing form. Mr. Brooks assured Plaintiff that he completed the sheet, dropped his belongings in the parking lot and went to the log book. Mr. Brooks stared in disbelief at the missing document and again assured Plaintiff he had completed it and put it in the book the morning before. Plaintiff ordered him to replace it, which he did immediately. Mr. Brooks stated that there was a possibility that Captain Knappage might have taken the sheet because Captain Knappage was in Station 2's office late the night before, sometime between 22:00 and midnight.

4.37   On the morning of September 15th, Plaintiff asked Captain Knappage if he had removed the document from the log book on the evening of September 12th. He denied doing so. When Plaintiff stated that Mr. Brooks had seen him there late that night, Captain Knappage then acknowledged going to Station 2 and taking the document – a direct violation of city, state and federal law. He offered no reason and seemed very uncomfortable. He never informed Plaintiff or the personnel assigned to Station 2 that he was removing documentation that was required to be in the log book and only admitted to doing so when confronted with a witness' account.

4.38   About fifteen minutes after Plaintiff's meeting with Captain Knappage, on September 15, 2011, Plaintiff was called to Defendant's Human Resources Department and placed on paid administrative leave.

4.39   On September 20, 2011, multiple departmental employees were instructed to provide written statements to the Sachse Fire Department. Fifteen employee statements were allegedly provided and received on or before September 11, 2011. None of those statements

were provided to Plaintiff at any time. Captain Knappage's handling of the investigation was in direct violation of Texas law and of the Defendant's own internal policy regarding investigations and complaints.

4.40 While Plaintiff was on administrative leave, the Defendant began wholesale revision of many of its standard operating policies and procedures. Having clearly seen that its vague and general policies were inadequate to insure compliance by the paramedics to complete certain forms, the Defendant's policy changes outlined what forms it expected paramedics to complete on a daily basis and, therefore, what forms it expected supervisors to review on a more frequent basis. As to the forms themselves, the Defendant changed the forms to include more information, including date, time, signature, and personnel responsible for completing and/or supervising the work. None of these policies and procedures, nor the specific forms with appropriate language were previously produced, required, used or demanded by the Defendant of any of its personnel, including officers – although Plaintiff requested such changes on a number of prior occasions. Each of Plaintiff's requests was squarely rejected by Chief Kendrick.

4.41 Following the "investigation," two employees received oral warnings, one employee received a letter of counseling and a one month suspension from the paramedic program, six employees received written reprimands, and four employees received suspension without pay. Captain Knappage and Chief Kendrick were personally engaged in all of the policy changes and discipline imposed and, upon information and belief, Captain Coleman and Ms. Bontrager also were involved.

4.42 On October 21, 2011, Plaintiff received a memorandum regarding a disciplinary conference from Chief Kendrick. It outlined four charges against Plaintiff for alleged violations of various policies and procedures.

4.43    Charge one stated that personnel under Plaintiff had failed to properly complete their communication logs, check sheets, and inventories. Although vague and unclear, the alleged violation by Plaintiff regarding these matters was apparently a failure to properly supervise, based on general unspecified policies.

4.44    Charge Two alleged that Plaintiff made inappropriate statements at Station 2 to the C Shift on September 10, 2011. This charge included quotes that Plaintiff had supposedly made statements about he was "under the bus" and/or that he "will drag everyone under with him."

4.45    Charge Three alleged that Plaintiff had failed to properly notify his administrative staff or HR about the resignation of Greg Fenn because he delayed one hour and fifteen minutes following Fenn's resignation.

4.46    Charge Four alleged that Plaintiff had improperly handled new employee training and testing for EMS personnel, as well as EMS continuing education and certification cards.

4.47    Chief Kendrick provided no witness statement, affidavits, or other substantiating documents with his October 21, 2011 email. Likewise, the only "complaint" referenced or attached by Chief Kendrick was the email communication from Mr. Fenn dated September 9, 2011. Chief Kendrick references that email and describes it as a "complaint" that substantiates the memorandum and investigation. At the conclusion of his memorandum, Chief Kendrick recommended that Mr. Wood be terminated and set a date for Plaintiff's disciplinary conference.

4.48    Over the next several days and weeks, Plaintiff and his counsel repeatedly advised the Defendant that Plaintiff not been provided proper documentation, including a signed written complaint by a complaining individual, as required by Texas law. Plaintiff also stated that no

documentation or witness statements had been provided to him in response to the allegations set forth by Chief Kendrick, also as required by Texas law.

4.49 Before and after October 21, 2011, Chief Kendrick, Captain Coleman, Captain Knappage and others engaged in and undertook a conspiracy and cover-up to retroactively justify their actions against Mr. Wood. This included soliciting false statements from multiple employees of the Defendant regarding Plaintiff, all of which obtained after the issuance of Chief Kendrick's October 21, 2011 memorandum.

4.50 The purpose of all of the Defendant's actions before and after the issuance of the October 21, 2011 memorandum was to scapegoat Plaintiff, while simultaneously protecting the Defendant from any governmental investigation, and to insulate Chief Kendrick, Captain Coleman, and Captain Knappage from any culpability, discipline or accountability for the pervasive and systematic failure of Defendant's EMS system.

4.51 After receipt of Plaintiff and his counsel's complaints, Defendants issued a second memorandum of charges on October 28, 2011. While the substance of the charges was the same, Defendant then attempted to have Captain Knappage sign the memorandum to justify it as a complaint under Chapter 614 of the Texas Government Code. Knowing full well that their earlier actions had been in violation of Texas law, the Defendants attempted to remove Mr. Fenn as the complainant and substitute Captain Knappage—a wrongful and conspiratorial act under Texas law in an attempt to deprive Plaintiff of due process and legal protections afforded under the Government Code. Nonetheless, Defendants again failed to provide any meaningful witness statement or affidavits from any complaining employees resulting from the internal investigation by Captain Knappage.

4.52    Throughout this process, the Defendant intentionally and/or recklessly placed Captain Knappage in charge of this investigation and allowed him to generate a false complaint(s) against the Plaintiff knowing that the complaints set forth by Mr. Fenn specifically and directly addressed only the conduct of Defendant, Captain Knappage and Chief Kendrick *not* the Plaintiff. Defendant intentionally and/or recklessly placed Captain Knappage in charge of this investigation so that he would protect himself and/or Chief Kendrick from any criticism that arose from Mr. Fenn's email and complaint against the Department, Chief Kendrick, and Captain Knappage.

4.53    The ultimate goal of this course of conduct was to frame the Plaintiff as being responsible or at fault for the issues that he uncovered and memorialized to Captain Knappage and to Chief Kendrick, including previous reports that demonstrated fundamental, systematic failures involving nearly 75% of personnel in the Fire Rescue Department and 100% of the officers, including the Chief of the Defendant. In this way, Chief Kendrick and Captain Knappage could retain their power and control over the Department and the Defendant, and the Department could attempt to minimize or avoid discipline from any outside agencies.

4.54    No complaint was ever generated or filed by the Defendant against any other officer, including Captain Coleman, Lieutenant Willoughby, Captain Knappage, or Chief Kendrick – all of who were equally or more responsible for the failures alleged against the Plaintiff. Nonetheless, Plaintiff was ultimately terminated while these other officers and Chief Kendrick received absolutely no discipline whatsoever from the Defendant.

4.55    After receiving notice from both Chief Kendrick and from Captain Knappage that the recommendation was to terminate Plaintiff, Plaintiff attended his disciplinary conference in accordance with the requirements of Defendant's policies and procedures. At that conference,

Plaintiff outlined his response to each of the charges and how his firing and termination was unjustified under Texas law and the facts presented. Chief Kendrick followed his recommendation and that of Captain Knappage to terminate the Plaintiff.

4.56 Following the termination, Plaintiff then exercised his right and appealed the decision to the City Manager. Plaintiff and his counsel attended the appeal before Mr. Billy George, the City Manager on Monday, November 28, 2011. Chief Kendrick, Ms. Bontrager, the City Attorney appeared on behalf of the Defendant. Mr. George ran the meeting and told Plaintiff that he or his counsel could present matters responsive to each charge.

4.57 When Plaintiff and his counsel began presenting their arguments and authorities, on several occasions, Mr. George unilaterally announced that he would refuse to hear certain positions. For example, Plaintiff and his counsel argued that Plaintiff was being terminated for not supervising in a specific manner, yet the prior policies and procedures did not provide him with any authority, direction, or requirements to so supervise. Plaintiff and his counsel argued that the best evidence of the deficiency and lack of specificity of these policies was the fact that the Defendant amended, altered and revised the same policies after September 9, 2011. Mr. George refused to hear those positions and stated he was unwilling to consider any changes in policy in his decision making process, even though Plaintiff's main contention was a retroactive application of the new policies.

4.58 Plaintiff and his counsel argued that no other employee of the Defendant had been terminated except for Plaintiff, including all of the underlying individuals who were directly responsible for completing the paperwork and failed to do so. There were approximately sixteen to eighteen paramedics who had failed at this task and, in most instances, these individuals received written or verbal reprimands. Plaintiff and his counsel asked Mr. George how it was

possible that Plaintiff, as a supervisor, would be terminated, yet the individuals who were directly responsible for completing the task were not? Mr. George's response to this argument of disproportionate discipline was words to the effect that "We would have to basically scrap the entire Fire Rescue Department and start over," which Defendant would not do.

4.59    At the conclusion of the meeting, Mr. George stated that he would provide a determination and decision in the matter to Plaintiff within the next two weeks. On Friday, December 9, 2011, Plaintiff was alerted that Mr. George had upheld the ruling of Chief Kendrick despite the presentation of arguments and evidence from Plaintiff during the appeal.

4.60    Plaintiff's appeal was therefore denied and he has now exhausted all administrative remedies available to him relating to his termination.

## V.    FIRST CAUSE OF ACTION – VIOLATION OF DUE COURSE OF LAW

5.1    Plaintiff adopts and incorporates, by reference, paragraphs 1.1 to 4.60, verbatim.

5.2    Defendant failed to comply with Texas Government Code § 614.021, et seq.

5.3    Any investigation of Plaintiff arose from the initial report by Mr. Greg Fenn, a prior employee who made complaints about Defendant's conduct.

5.4    Mr. Fenn never provided Defendant with a written or signed complaint against Plaintiff. To the contrary, Mr. Fenn specifically stated that he had no complaint against the Plaintiff and that his complaint was against Captain Knappage, Chief Kendrick, and Defendant's Fire Rescue Department. Mr. Fenn also stated that Plaintiff had always taken his complaints seriously and he believed Plaintiff to be a good, honorable, and law abiding officer.

5.5    Plaintiff was originally provided with a notice of charges that was not signed by Mr. Fenn or anyone else. At some point, only hours before his "hearing," Plaintiff received a revised notice of charges signed by Captain Knappage.

5.6    Despite Plaintiff's requests, Defendant provided Plaintiff no signed complaint from Mr. Fenn, no witness statements, nor any affidavits signed and sworn to by any individuals. Plaintiff specifically articulated to Defendants, on multiple occasions, his inability to adequately reply and respond to the charges presented, because he had no factual or underlying basis or knowledge of the charges from any complaining witness.

5.7    Plaintiff would state that Defendant has failed to comply with the mandatory provisions of Texas Government Code § 614.022, et seq. These provisions state in part the disciplinary action "may not" be taken against a fire officer without such a signed complaint.

5.8    Chief Kendrick had a clear and unambiguous duty to refrain from any disciplinary action against Plaintiff when the sole "complaint" relied on by him to satisfy the foregoing sections was Captain Knappage's internal report and notice of potential disciplinary action.

5.9    Plaintiff is entitled to have the disciplinary action withdrawn and set aside and to be restored with full back pay, benefits, and other damages as a result of Defendant's conduct.

## VI.    DAMAGES AND ATTORNEY'S FEES

6.1    Plaintiff adopts and incorporates, by reference, paragraphs 1.1 to 5.9, verbatim.

6.2    Plaintiff would show that, as a direct and proximate cause of the Defendant's conduct, he has incurred loss of past and future earnings and earning capacity, loss of past and future benefits and seniority rights, and past and future mental anguish.

6.3    Plaintiff hereby requests a permanent injunction reinstating him to his position and rank as a lieutenant in Defendant's Fire Rescue Department. Plaintiff also requests a permanent injunction from the Court requiring Defendant to rescind their termination of Plaintiff and withdraw and set aside the disciplinary action.

6.4     Plaintiff would show that the conduct of Defendant constitutes both malice and gross negligence as those terms are defined by Texas law and entitle Plaintiff to recover from Defendant exemplary damages in amount and character as may be necessary to punish this Defendant and to deter others of similarly lawless inclinations in the future.

6.5     Such items of damages have a value well in excess of the minimum jurisdictional limits of the Court, for which some Plaintiff here and now sues.

## VII.     CONDITIONS PRECEDENT

7.1     All other conditions precedent to the filing of this suit have occurred or have been satisfied.

## VIII.     PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited in terms of law to appear and answer herein and that upon final trial, Plaintiff have and recover judgment against Defendant for all damages incurred by him, for attorney's fees incurred by him, for all costs of court, for pre and post-judgment interest at the maximum lawful rate, for injunctive relief and reinstatement, and for such other further relief, whether general or specific, based in law or in equity, to which Plaintiff may show himself justly entitled.

Respectfully submitted,

**AYRES LAW OFFICE, P.C.**

By: _____
**CHRISTOPHER S. AYRES**
State Bar No. 24036167
csayres@ayreslawoffice.com
**R. JACK AYRES, JR.**
State Bar No. 01473000
rjayres@ayreslawoffice.com
**BENJAMIN C. YELVERTON**
State Bar No. 24084132
bcyelverton@ayreslawoffice.com
4350 Beltway Drive
Addison, TX 75001
972-991-2222 (Telephone)
972-386-0091 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served email and via certified mail, return receipt requested on the below counsel of record on this, the ___ day of April, 2015.

Robert Maris
rmaris@marislanier.com
Marigny A. Lanier
mlanier@marislanier.com
MARIS & LANIER, P.C.
3710 Rawlins Street, Suite 1550
Dallas, Texas 75219

_____
Benjamin C. Yelverton

# EXHIBIT "B"

| DAN WOOD, | § | IN THE DISTRICT COURT OF |
|---|---|---|
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | DALLAS COUNTY, TEXAS |
| | § | |
| CITY OF SACHSE, | § | |
| | § | |
| Defendant. | § | 298TH JUDICIAL DISTRICT |

## PLAINTIFF'S SIXTH AMENDED RESPONSE TO DEFENDANT'S REQUEST FOR DISCLOSURE

TO: Defendant, City of Sachse, by and through its attorney of record, Robert Maris, MARIS & LANIER, P.C., 3710 Rawlins, Suite 1550, Dallas, Texas 75219.

COMES NOW, Dan Wood, Plaintiff the above-entitled and numbered cause and pursuant to the Texas Rules of Civil Procedure 194, serves the following Sixth Amended Response to Defendant's Request for Disclosure.

Respectfully Submitted,

**AYRES LAW OFFICE, P.C.**

By: _____

**CHRISTOPHER S. AYRES**
State Bar No. 24036167
csayres@ayreslawoffice.com
**R. JACK AYRES, JR.**
State Bar No. 01473000
rjayres@ayreslawoffice.com

4350 Beltway Drive
Addison, Texas 75001
Telephone: 972.991.2222
Facsimile: 972.386.0091

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served via certified mail, return receipt requested on the below counsel of record on this, the 5th day of November, 2015.

Robert Maris
MARIS & LANIER, P.C.
3710 Rawlins Street, Suite 1550
Dallas, Texas 75219

Christopher S. Ayres

## DISCLOSURE RESPONSES

(a)    the correct names of the parties to the lawsuit;

**RESPONSE:**

Plaintiff believes the parties are correctly named.

(b)    the name, address and telephone number of any potential parties;

**RESPONSE:**

Plaintiff is not aware of any potential parties at this time.

(c)    the legal theories and, in general, the factual bases of your claims or defenses;

**RESPONSE:**

Plaintiff Dan Wood was a lifelong firefighter and paramedic, who had spent decades working in the fire service in the Dallas/Fort Worth area. On December 25, 2006, Plaintiff was hired by Defendant City of Sachse as a firefighter/paramedic and less than one year later, was promoted to Lieutenant of Defendant's Fire Department. Thereafter, Plaintiff received consistently high marks and evaluations in his role as an officer and was designated as the "Fire Training Officer" for the Defendant's Fire Department.

Despite his many requests for and attempts at detailing what his specific roles and responsibilities were to be at Defendant's Fire Department, Plaintiff received no direction from his superiors. Defendant had no polces or procedures in place that would improve accountability, documentation, training and/or administration of the Department.

On Friday, September 9, 2011, Plaintiff arrived to work at Station 1 where he was assigned to be the Officer in Charge of Defendant's "B" shift. Shortly after arriving, Plaintiff found Mr. Greg Fenn, a part-time paramedic/firefighter with Defendant in a highly frustrated and agitated state. Mr. Fenn indicated that, during his inventory and restocking of the ambulance at Station 1, he had noticed that there were expired, inadequate, and missing medications. Mr. Fenn stated this had happened on several prior occasions, as well. Mr. Fenn indicated that he was frustrated and tired of consistently noting these problems and yet, Defendant's EMS operations supervisors never addressed or corrected them. Mr. Fenn ultimately resigned that day, stating he no longer desired to work for Defendant, as doing so may compromise his professional licensure.

At this point, as the command officer on duty, Plaintiff was confronted with several serious issues. First, he now had an ambulance out of service because it did not have the proper staffing because of Mr. Fenn's unexpected resignation. Second, Plaintiff was aware that Mr.

Fenn had not addressed and remedied the expired, inadequate, and missing medications he previously discovered. In addition, several of Plaintiff's other daily checks remained outstanding. All of these situations put patients and the citizens of the Defendant at risk. Under both state and federal law, Plaintiff was required, as a certified paramedic and officer, to remedy these situations immediately and without delay.

At approximately 10:02 a.m., Plaintiff sent Captain Knappage a formal memorandum outlining the resignation of Greg Fenn, as well as Plaintiff's actions to request Mr. Fenn to remove a certain Facebook posting about his resignation.

While conducting the inventory and examination of all matters on the morning of September 9, 2011, Plaintiff learned that there were a number of expired medications on A-1 (the ambulance at Station 1) and A-2 (the ambulance at Station 2). Plaintiff reviewed the books and records of each station to determine which paramedics worked on those ambulances and why they had failed to note the expired nature of the medications and/or replace these medications. After conducting an examination of those matters, Plaintiff then presented a memorandum to Captain Knappage at approximately 11:30 a.m. concerning the expired medications and the personnel working on them. A supplemental memorandum was to be provided later that afternoon.

On or about 12:48 p.m., Mr. Fenn sent an email to all personnel in Defendant's Fire Rescue Department. Ms. Bontrager, as Director of Human Resources, was also provided this email. In the email, Mr. Fenn stated that he was resigning due to a "lack of accountability and professionalism with how the EMS side has handled…" Mr. Fenn relayed his frustration with prior instances that were unaddressed and the danger of expired and missing medications, including "controlled narcotics." Mr. Fenn completed his email by stating that he had filed a formal complaint against the Defendant with the Texas Department of State Health Services. Mr. Fenn stated, "The intention is to improve the quality of services the EMS system provides."

The email sent by Mr. Fenn never mentioned Plaintiff. Mr. Fenn's email completely and consistently takes issue with the EMS operations of the Defendant's Fire Rescue Department, for which Plaintiff had no ongoing role or responsibility. Instead, the issues raised by Mr. Fenn were the responsibility of Chief Kendrick, Captain Knappage, and/or Captain Coleman. Upon learning that the Defendant had later uses this email as a complaint against Plaintiff, Mr. Fenn apparently delivered a letter to the Defendant stating that he had the upmost confidence in Plaintiff, that Plaintiff had been a superior and steady officer, that Plaintiff had attempted to resolve all issues previously raised by Mr. Fenn, and that Mr. Fenn's issues were with Chief Kendrick, Captain Knappage, and the EMS operations side of the Fire Department – not with the Plaintiff.

During Plaintiff's investigation on September 9, 2011, in addition to the expired medications, Plaintiff noticed that there were other deficiencies in the paperwork and documentation of multiple paramedics. Upon investigation, Plaintiff learned that these problems persisted at both stations and across all three shifts during the month of September. This included Plaintiff's shift, Captain Coleman's shift, and Lieutenant Willoughby's shift. In essence, the personnel working under these officers had not been completing their paperwork in

a diligent and appropriate manner. Upon reporting this issue to Captain Knappage, Captain Knappage instructed Plaintiff to undertake a review back to the first day of September and to prepare a memorandum.

While preparing his memorandum, Plaintiff learned that his shift had also failed to properly complete certain paperwork relating to A-2 prior to September. Although not ordered or instructed by Captain Knappage to do so, Plaintiff included this finding in his memorandum in an effort to be complete, accurate, and to further the best interest of Defendant's Fire Rescue Department.

Because of the seriousness of the issues, on September 9, 2011, Plaintiff requested that Captain Coleman come to Station 1 to personally oversee ordering the inventory. When Captain Coleman arrived, Plaintiff alerted him to the issues with both medications and paperwork, including his shifts' deficiencies. Plaintiff alerted Captain Coleman to his issuance of various memos, in accordance with the orders of Captain Knappage.

Similar to Captain Coleman, Plaintiff also sent a text message to Lieutenant Willoughby requesting a meeting. Although Lieutenant Willoughby did not respond, the next morning, after Lieutenant Willoughby arrived, Plaintiff went over all of the issues and memorandum with Lieutenant Willoughby. In addition to discussing the issues with Lieutenant Willoughby, Plaintiff apologized to Lieutenant Willoughby for B shift's lack of documentation, inventory, and the general "mess" at Station 2. Plaintiff thought this apology necessary because his shift (B Shift) should have shown Lieutenant Willoughby's shift (C Shift) the courtesy of a clean and properly documented station. Plaintiff then told Lieutenant Willoughby that he intended to go by Station 2 to discuss with C Shift whether they had noticed any of the prior issues with B shift at Station 2, to relay his apology, and to continue his investigation, as ordered by Captain Knappage. Lieutenant Willoughby expressed no reservation with Plaintiff's planned course of action.

Accordingly, at approximately 7:45 a.m. on September 10, 2011, Plaintiff arrived at Station 2 to both apologize and gather information for his investigation. At this point, all memorandums were turned in to Captain Knappage, per his orders. Plaintiff then discussed with the C Shift at Station 2 the various problems he had observed regarding documentation for all shifts, the lack of inventory and medication controls, and other deficiencies. Specifically, Plaintiff asked the C Shift why they had not alerted him or Lieutenant Willoughby to any of the problems noticed concerning B Shift, and why they themselves had not properly handled documentation and other matters.

At the time of the incident, as well as during the "investigation" that followed, Chief Kendrick was out of the country, although he was presumably notified by Captain Knappage (acting Chief at the time) that a complaint that had been field by Mr. Fenn and a potential significant ongoing investigation was looming by the Texas Department of State Health Services. Nonetheless, Chief Kendrick did not return to work until September 26, 2011. In the interim, despite the serious and systematic failures (including violations of state and federal law) noted by Plaintiff and relayed to Captain Knappage, as well as a potentially catastrophic state

investigation, Chief Kendrick allowed Captain Knappage to remain in complete operational control of Defendant's Fire Rescue Department.

On or about September 11, 2011, per the instructions and direction of the interim City Manager, Captain Knappage began an administrative inquiry and investigation based on the "complaints and the resignation letter of Greg Fenn." After reviewing the memorandum and information supplied by Plaintiff, which indicated systematic failures by over fifteen paramedics employed by the Defendant as well as a complete and utter failure of Captain Coleman and Captain Knappage to properly run and operate the EMS and supply system of the Defendant's Fire Rescue Department, Captain Knappage then met with Captain Coleman, Ms. Bontrager, and the Defendant's City Attorney. In that meeting, which occurred on or about September 12, 2011, the group decided to place *Plaintiff* on paid administrative leave beginning on September 15, 2011.

On September 13, Plaintiff stopped by Station 2 to inspect the station just as he had on September 10th. Plaintiff noticed the required ambulance check sheet was missing from the log book. Plaintiff found one of the two people assigned to the station the day before, Shermonte Brooks, in the parking lot and asked him about the missing form. Mr. Brooks assured Plaintiff that he completed the sheet, dropped his belongings in the parking lot and went to the log book. Mr. Brooks stared in disbelief at the missing document and again assured Plaintiff he had completed it and put it in the book the morning before. Plaintiff ordered him to replace it, which he did immediately. Mr. Brooks stated that there was a possibility that Captain Knappage might have taken the sheet because Captain Knappage was in Station 2's office late the night before, sometime between 22:00 and midnight.

On the morning of September 15th, Plaintiff asked Captain Knappage if he had removed the document from the log book on the evening of September 12th and he denied doing so. When Plaintiff stated that Mr. Brooks had seen him there late that night, Captain Knappage then acknowledged going to Station 2 and taking the document – a direct violation of city, state and federal law. He offered no reason and seemed very uncomfortable. He never informed Plaintiff or the personnel assigned to Station 2 that he was removing documentation that was required to be in the log book and only admitted to doing so when confronted with a witness' account.

About fifteen minutes after Plaintiff's meeting with Captain Knappage, on September 15, 2011, Plaintiff was called to Defendant's Human Resources Department and placed on paid administrative leave.

On September 20, 2011, multiple departmental employees were instructed to provide written statements to the Sachse Fire Department. Fifteen employee statements were allegedly provided and received on or before September 11, 2011. None of those statements were provided to Plaintiff at any time. Captain Knappage's handling of the investigation was in direct violation of Texas law and of the Defendant's own internal policy regarding investigations and complaints.

While Plaintiff was on administrative leave, the Defendant began wholesale revision of many of its standard operating policies and procedures. Having clearly seen that its vague and

general policies were inadequate to insure compliance by the paramedics to complete certain forms, the Defendant's policy changes outlined what forms it expected paramedics to complete on a daily basis and, therefore, what forms it expected supervisors to review on a more frequent basis. As to the forms themselves, the Defendant changed the forms to include more information, including date, time, signature, and personnel responsible for completing and/or supervising the work. None of these policies and procedures, nor the specific forms with appropriate language were previously produced, required, used or demanded by the Defendant of any of its personnel, including officers – although Plaintiff requested such changes on a number of prior occasions. Each of Plaintiff's requests was squarely rejected by Chief Kendrick.

Following the "investigation," two employees received oral warnings, one employee received a letter of counseling and a one month suspension from the paramedic program, six employees received written reprimands, and four employees received suspension without pay. Captain Knappage and Chief Kendrick were personally engaged in all of the policy changes and discipline imposed and, upon information and belief, Captain Coleman and Ms. Bontrager also were involved.

On October 21, 2011, Plaintiff received a memorandum regarding a disciplinary conference from Chief Kendrick. It outlined four charges against Plaintiff for alleged violations of various policies and procedures.

Chief Kendrick provided no witness statement, affidavits, or other substantiating documents with his October 21, 2011 email. Likewise, the only "complaint" referenced or attached by Chief Kendrick was the email communication from Mr. Fenn dated September 9, 2011. Chief Kendrick references that email and describes it as a "complaint" that substantiates the memorandum and investigation. At the conclusion of his memorandum, Chief Kendrick recommended that Mr. Wood be terminated and set a date for Plaintiff's disciplinary conference.

Over the next several days and weeks, Plaintiff and his counsel repeatedly advised the Defendant that Plaintiff not been provided proper documentation, including a signed written complaint by a complaining individual, as required by Texas law. Plaintiff also stated that no documentation or witness statements had been provided to him in response to the allegations set forth by Chief Kendrick, also as required by Texas law.

Before and after October 21, 2011, Chief Kendrick, Captain Coleman, Captain Knappage and others engaged in and undertook a conspiracy and cover-up to retroactively justify their actions against Mr. Wood. This included soliciting false statements from multiple employees of the Defendant regarding Plaintiff, all of which obtained after the issuance of Chief Kendrick's October 21, 2011 memorandum.

The purpose of all of the Defendant's actions before and after the issuance of the October 21, 2011 memorandum was to scapegoat Plaintiff, while simultaneously protecting the Defendant from any governmental investigation, and insulate Chief Kendrick, Captain Coleman, and Captain Knappage from any culpability, discipline or accountability for the pervasive and systematic failure of Defendant's EMS system.

After receipt of Plaintiff and his counsel's complaints, Defendants issued a second memorandum of charges on October 28, 2011 mere hours before Plaintiff's disciplinary hearing. While the substance of the charges was the same, Defendant then attempted to have Captain Knappage sign the memorandum to justify it as a complaint under Chapter 614 of the Texas Government Code. Knowing full well that their earlier actions had been in violation of Texas law, the Defendants attempted to remove Mr. Fenn as the complainant and substitute Captain Knappage –a wrongful and conspiratorial act under Texas law in an attempt to deprive Plaintiff of due process and legal protections afforded under the Government Code. Nonetheless, Defendants again failed to provide any meaningful witness statement or affidavits from any complaining employees resulting from the internal investigation by Captain Knappage.

Throughout this process, the Defendant intentionally and/or recklessly placed Captain Knappage in charge of this investigation and allowed him to generate a false complaint(s) against the Plaintiff knowing that the complaints set forth by Mr. Fenn specifically and directly addressed only the conduct of Defendant, Captain Knappage and Chief Kendrick _not_ the Plaintiff. Defendant intentionally and/or recklessly placed Captain Knappage in charge of this investigation so that he would protect himself and/or Chief Kendrick from any criticism that arose from Mr. Fenn's email and complaint against the Department, Chief Kendrick, and Captain Knappage.

The ultimate goal of this course of conduct was to frame the Plaintiff as being responsible or at fault for the issues that he uncovered and memorialized to Captain Knappage and to Chief Kendrick, including previous reports that demonstrated fundamental, systematic failures involving nearly 75% of personnel in the Fire Rescue Department and 100% of the officers, including the Chief of the Defendant. In this way, Chief Kendrick and Captain Knappage could retain their power and control over the Department and the Defendant, and the Department could attempt to minimize or avoid discipline from any outside agencies.

No complaint was ever generated or filed by the Defendant against any other officer, including Captain Coleman, Lieutenant Willoughby, Captain Knappage, or Chief Kendrick – all of who were equally or more responsible for the failures alleged against the Plaintiff. Nonetheless, Plaintiff was ultimately terminated while these other officers and Chief Kendrick received absolutely no discipline whatsoever from the Defendant.

After receiving notice from both Chief Kendrick and from Captain Knappage that the recommendation was to terminate Plaintiff, Plaintiff attended his disciplinary conference in accordance with the requirements of Defendant's policies and procedures. At that conference, Plaintiff outlined his response to each of the charges and how his firing and termination was unjustified under Texas law and the facts presented. Chief Kendrick followed his recommendation and that of Captain Knappage to terminate the Plaintiff.

Plaintiff appealed his termination, exhausting all administrative remedies available.

Plaintiff asserts Defendant violated Plaintiff's Due Course of Law rights under Chapter 614 of the Texas Government Code. Plaintiff sues for loss of past and future earnings and

earning capacity, loss of past and future benefits and seniority rights, past and future mental anguish, incidental damages, attorney's fees, court costs, and pre- and post-judgment interest.

Plaintiff would refer Defendant to his live petition, specifically Sections 4-6 which more fully outline in greater detail Plaintiff's factual claims, causes of actions and damages.

(d)     the amount and any method of calculating economic damages;

**RESPONSE:**

### LOSS OF EARNINGS

While at his position in Sachse, Plaintiff earned $82,082.94 in 2009, $77,545.55 in 2010, and, from January 1, 2011 until he was terminated on November 8, 2011, wages of $64,163.64, which means he was on track to earn $75,063.23 in 2011. These figures yield an average of $78,230.57 in annual earnings at Sachse, or approximately $6,519.21 each month. As a direct and proximate result of the Defendant's wrongful termination of Plaintiff, he was unemployed for five consecutive months. Therefore, Defendant is liable to Plaintiff for his lost wages from his period of unemployment in the amount of $32,596.05.

Plaintiff mitigated his damages due to the Defendant's wrongful termination by securing a position with the City of Sherman, Texas Fire Department on April 12, 2012, approximately three (3) years ago, as of the date of these responses. As you can see from his W-2's for the years 2009-2014, which are being produced as supplemental production at Bates No. 944 – 986 in connection with these responses, he was forced to accept a reduction in pay at his new position in Sherman, both in terms of base salary and in the amount of overtime he was able to secure. Specifically, Plaintiff reported wages of $34,878.81 (pro-rated to $48,405.95 in order to account for the period of time he was unemployed) in 2012, $52,674.53 in 2013, and $57,243.99 in 2014. These figures yield an average annual income of $52,774.82 per year, or $25,455.75 less than he was able to earn annually at his position in Sachse. Consequently, the figures and documentation attached establish that, to date, the Plaintiff has suffered lost wages in the past in the amount of approximately **$108,963.30.**

Furthermore, Plaintiff's termination from Sachse FD was a major setback in his career trajectory, which forced him to "start over" at Sherman FD. His lost earning capacity will continue to follow him throughout his career, because there is every reason to assume that his earning potential would have increased sooner and until he retired in 2020 at the age of 65, had he not been terminated from Sachse FD. Under the circumstances, assuming a modest loss of earning capacity of $10,000.00 more per year for the currently remaining 10 years of his useful worklife is a reasonable estimate of his loss of future earnings. Therefore, Plaintiff is seeking **$100,000.00** in compensation for loss of earning capacity in the future. Please see Plaintiff's supplemental production at Bates No. 950 – 986 for additional evidence supporting Plaintiff's claim for loss of earning capacity in the future.

## LOSS OF PENSION/BENEFITS

Because Plaintiff sustained a reduction in pay, his pension received less money in contributions. Like with Defendant's Fire Department, the contribution to Plaintiff's pension plan with his new employer is 21% of his salary and overtime pay. Due to the pay reduction and lack of overtime, Plaintiff's contributions for the last three years averaged $6,300.00 per year less than when he was employed by Defendant. This yearly loss accumulated to at least **$18,900.00** over the three years since his termination by Defendants.

When Plaintiff lost his health insurance benefits, he had to seek alternative coverage with his wife's health insurance company through her employer. Plaintiff paid $263.14 bi-monthly for four-and-a-half months, for a total of $2,368.26.

## MISCELLANEOUS EXPENSES

Plaintiff incurred miscellaneous expenses while seeking alternative employment. For each of the 18 interview processes Plaintiff underwent, he had to produce copies of his personal history statements, certifications and applications. Plaintiff estimates he incurred $500-$1,000 in costs for paper, ink and copies. In addition, Plaintiff incurred **$2,656.23** in past mileage (4,786 miles multiplied by fifty-five-and-a-half-cents), broken down as follows:

| POTENTIAL EMPLOYER | MILEAGE ROUNDTRIP | NUMBER OF TRIPS TAKEN | TOTAL MILEAGE |
|---|---|---|---|
| Highland Park Fire Dept | 44 | 7 | 308 |
| Bedford Fire Dept | 84 | 4 | 336 |
| Murphy Fire Dept | 2 | 8 | 16 |
| Kennedale Fire Dept | 120 | 2 | 240 |
| Lake Cities Fire Dept | 76 | 4 | 304 |
| Little Elm Fire Dept | 88 | 4 | 352 |
| Midlothian Fire Dept | 102 | 6 | 612 |
| Allen Fire Dept | 22 | 4 | 88 |
| Coppell Fire Dept | 54 | 3 | 162 |
| Sherman Fire Dept | 96 | 5 | 480 |
| Westlake Fire Dept | 92 | 3 | 276 |
| Southlake Fire Dept | 80 | 4 | 320 |
| Crowley Fire Dept | 148 | 2 | 296 |
| DFW DPS | 50 | 1 | 50 |
| Keller Fire Dept | 88 | 3 | 264 |
| Aubrey Fire Dept | 88 | 3 | 264 |
| 370 Vision, Georgetown | 386 | 1 | 386 |
| Star Plus EMS, McKinney | 32 | 1 | 32 |
| **TOTAL:** | | | **4,786** |

Additionally, Plaintiff's new place of employment is located in Sherman, Texas. Accordingly, Plaintiff must now drive 106 miles roundtrip for work as opposed to the six-mile-roundtrip Plaintiff drove when working at Defendant's Fire Department. To a reasonable degree

of probability, this equates to 143,000 more miles Plaintiff will have to drive over the next thirteen years until such time as Plaintiff reaches age 65. (110 work days x 100 miles x 13 years) Such additional mileage represents approximately **$79,365.00** in future mileage (143,000 multiplied by fifty-five-and-a-half-cents).

**MENTAL ANGUISH:**

Plaintiff seeks an award for past and future mental anguish in an amount deemed appropriate by the fact finder.

**ATTORNEY'S FEES AS DAMAGES:**

Plaintiff seeks an award for his attorney's fees and costs (*see* Plaintiff's live petition as well as Plaintiff's Response to Request for Disclosure No. 194.2(f) herein).

In addition to the attorney's fees incurred herein, Plaintiff incurred $15,000.00 in attorney's fees in defending himself in the underlying investigation as well as an additional $3,500.00 attorney's fees in pursuing his claim with the Texas Workforce Commission, which he ultimately prevailed on.

**ATTORNEY'S FEES AND COSTS INCURRED PURSUING THIS LITIGATION**

In the course of the current litigation, Plaintiff has incurred **$82,059.38** in attorney's fees and **$1,575.49** in taxable court costs. That number does not include any work related to the Defendant's appeal of the Trial Court's denial of their Plea to the Jurisdiction on Plaintiff's Texas Whistleblower claims.

In total, Plaintiff's claim for attorney's fees and costs totals **$102,134.87.**

(e)     the name, address and telephone number of persons having knowledge of relevant facts, and a brief statement of each identified person's connection with the case;

**RESPONSE:**

Dan Wood
323 Linhurst Drive
Murphy, Texas 75094
(214) 762-7046
*Plaintiff*

Christine McBride Wood
323 Linhurst Drive
Murphy, Texas 75094
(214) 762-7046
*Plaintiff's wife*

Chief Doug Kendrick
Fire Chief
City of Sachse
3815 D. Sachse Rd.
Sachse, Texas 75048
(972) 495-0975
*Fire Chief at time of incident*

Captain Robert Knappage
Fire Marshall/EMS Captain
City of Sachse
3815 D. Sachse Rd.
Sachse, Texas 75048
(972) 461-9801 (office)
(469) 628-7221 (cell)
*Acting Chief at time of incident*

Lieutenant Willoughby
City of Sachse
3815 D. Sachse Rd.
Sachse, Texas 75048
(972) 495-0975
*Lieutenant at time of incident*

Cheree' Bontrager
City of Sacshe
3815 D. Sachse Rd.
Sachse, Texas 75048
(972) 429-4799
*Director of Human Resources at time of incident*

Gregory M. Fenn
4224 Talbot Lane
McKinney, Texas 75070
214-326-6510
*Former paramedic/firefighter with Defendant*

Firefighter Jody Krizan
Firefighter Chris Hall
Firefighter Kyle Potraza
Firefighter Ryan Stallings
Firefighter Clay Hodges
Firefighter John Morris
Firefighter Shermonte Brooks
Firefighter Chris Hall
Firefighter Brandon Slone

Firefighter Kyle Potraza
Firefighter Ryan Cortex
Firefighter Kenneth Messick
Firefighter Daniel Malone
3815 D Sachse Rd.
(972) 495-0975
*Firefighters who gave statements during the complaint investigation*

Jerry E. Simmons
Garrett Puls
Adam Kroviak
Brian Crutvher
Jordan Carter
Drex Dorman
3815 D Sachse Rd.
(972) 495-0975
*Employees who may have knowledge of the training*

Linda Morrow
Human Resources Director
3815 Sachse Rd.
Sachse, texas
(469) 429-4770
*Knowledge and testimony concerning Payroll Code Reports regarding hours worked in the fire department and individual payroll and hours worked records concerning Plaintiff from 2010, 2011, and 2012.*

Jeri Rainey
City Manager's office
City of Sachse
3815 Sachse Road, Building B
Sachse, Texas 75048
*Interim City Manager at time of incident*

Billy George
City Manager
City of Sachse
3815 Sachse Road, Building B
Sachse, Texas 75048
*Upheld ruling of Chief Kendrick*

Joe Gorfida, Jr.
Nichols, Jackson, Dillard, Hager, & Smith, LLP
1800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
214-965-9900
*Sachse City Attorney*

Captain Rick Coleman
Operations Office/Sachse Fire Rescue
City of Sachse
3815 D. Sachse Rd.
Sachse, Texas 75048
(214) 876-8709 (cell)
*Captain at time of incident and Current Fire Chief at Sachse FD*

Robert B. Simonson, D.O.
Biocare Medical Control
Methodist Dallas Medical Center
1441 N. Beckley Avenue
Dallas, Texas 75203
*City of Sachse's Medical Director*

Gary Burcalow
3815 Sachse Rd.
Sachse, Texas
(972) 495-1212
*IT Administrator*

Terry Smith
City Secretary
3815 Sachse Rd.
Sachse Texas
(469) 429-4775
*Custodian of Records*

K. Cuello
Texas Workforce Commission
101 E. 15th Street, Room 410 Main
Austin, Texas 78778-0001
(512) 476-5289
*Hearing Officer*

Carol Speckman, LPC
100 North Central Expressway
Suite 402
Richardson, Texas 75080
972-786-6464
*Plaintiff's Healthcare Provider*

Amir Choudhry, M.D.
HeartPlace
6124 West Parker
Suite 432
Plano, Texas 75093
972-378-9560
*Plaintiff's Healthcare Provider*

James Olfson, M.D.
Family Healthcare Associates
2821 E. President George Bush Hwy
Richardson, Texas 75082
214-575-3422
*Plaintiff's Healthcare Provider*

Wal-Mart Pharmacy
150 W. FM 544
Murphy, Texas 75094
972-516-0264
*Plaintiff's Healthcare Provider*

Ron Whitehead
Town Manager
Town of Addison
5300 Belt Line Road
Addison, Texas 75254
(972) 450-7001
*Knowledge of Wood's employment in Addison*

Human Resources Representative
or Nancy Meadows, Interim HR Manager/ City Secretary
206 N. Murphy Road
(972) 468-4011
*Knowledge of Wood's application for employment*

Kimberly Prince
3300 Corinth Parkway
Corinth, Texas
(940) 498-3242
*Knowledge of Wood's application for employment*

Donna Jenkins, HR Director
Justin Vaughn, HR Manager
225 parkway Blvd.
City of Coppell, Texas
(972) 304-3611
*Knowledge of Wood's application for employment*

Kathy Phillips, Town Secretary
Ed Wellman, Assistant Fire Chief
100 West El Dorado Parkway
Little Elm, TX 75068
(214) 975-0404
*Knowledge of Wood's application for employment*

Kelly Edwards, Town Secretary
Richard Whitten, Fire Department
Mike Elliot, Fire Department
3 Village Circle, Suite 202
Westlake, TX 76262
(817) 490-5710
*Knowledge of Wood's application for employment*

Chief Joe Florentino
100 West Eldorado parkway
Little Elm, TX 75098
*Knowledge of Wood's application for employment*

Perry Elliot, Investigator
206 North Murphy Rd
Murphy, TX 75094
(972) 368-4300
*Knowledge of Wood's application for employment*

Chris Gideon, EMS Specialist
Texas Department of State Health Services
EMS Compliance – North Group
1301 S. Bowen Street #200
Arlington, TX 76013
*Knowledge of State Health investigation of Mr. Fenn's report of expired medications*

Debbie Munoz
Director of Member Services
Texas Municipal Retirement Systems
1200 North I 35
Austin, TX 78701
(512) 476-7577
*Knowledge of the TMRS retirement plan.*

(f)    for any testifying expert:

(1)    the expert's name, address and telephone number;

(2)    the subject matter on which the expert will testify;

(3)    the general substance of the experts' mental impressions and opinions and a brief

summary of the basis for them, or if the expert is not retained or employed by

you, or otherwise subject to your control, documents reflecting such information;

(4)    if the expert is retained or employed by you, or otherwise subject to your control:

(A)    all documents, tangible things, reports, models or data compilations that
have been provided to, reviewed by, or prepared by or for the expert in
anticipation of the expert's testimony; and
(B)    the expert's current resume and bibliography;

## RESPONSE:

R. Jack Ayres, Jr. and Christopher S. Ayres will testify as to the attorney's fees and costs Plaintiff has incurred in this matter. Specifically, Messers. Ayres and Ayres will testify as to: (1) the amount of work performed; (2) the attorney's fees and costs incurred; (3) and the reasonableness of the same. Messers. Ayres & Ayres have extensive backgrounds in litigation and will testify that the legal fees are customary, especially in relation to the case at hand. Messers. Ayres and Ayres will rely upon their knowledge as well as their participation in the case at hand as well as the TWC proceeding.

Plaintiff has previously provided the Curriculum Vitae of R. Jack Ayres, Jr. and Christopher S. Ayres.

In addition, Plaintiff hereby gives notice to Defendant that there are several non-retained witnesses in this case who possess expert knowledge regarding their various areas of expertise. These include, but are not limited to, Plaintiff Dan Wood, Captain Knappage, Chief Kendrick, and Greg Fenn. Both Plaintiff and Defendant have elicited expert testimony from these witnesses throughout this litigation, including at these witnesses' depositions, and Plaintiff reserves the

right to continue to elicit expert testimony from these witnesses at the trial of this cause. Plaintiff hereby serves notice of the same and demands strict proof of any prejudice or surprise to Defendant should Defendant object to this testimony.

(g)     any discoverable indemnity and insuring agreements;

**RESPONSE:**

None.

(h)     any discoverable settlement agreements;

**RESPONSE:**

None.

(i)     any discoverable witness statements;

**RESPONSE:**

Plaintiff would refer Defendant to the depositions taken in this matter, the statements referenced by Plaintiff in his Response to Request for Production Nos. 1 and 5, and the statements produced by Defendant's officers (Jody Krizan, Chris Hall, Kyle Potraza, Ryan Stallings, Clay Hodges, John Morris, Shermonte Brooks, Chris Hall, Brandon Slone, Kyle Potraza, Ryan Cortex, Kenneth Messick, and Daniel Malone).

(j)     all medical records and bills that are reasonably related to the injuries or damages asserted;

**RESPONSE:**

See medical records and medical bills obtained by virtue of the medical authorization furnished by Plaintiff.

(k)     all medical records and bills obtained by you by virtue of an authorization furnished     to you by Plaintiff;

**RESPONSE:**

Not applicable.

(l)    the name, address, and telephone number of any person who may be designated as a responsible third party.

**RESPONSE:**

None at this time.